FREDAL *v.* FORSTER.
FORSTER *v.* EVANS.

1. PARTIES—JOINDER—PROPERTY OWNERS—TOWNSHIPS—NUISANCE.
Joinder of private property owner plaintiffs with public township plaintiff in action to abate nuisance, where private plaintiffs proceeded on 2 theories of nuisance—in fact and *per se*—and public plaintiff joined on the *per se* theory, and where both asserted the same issues of violation, sought similar relief, used the same witnesses, facts, and allegation of injuries, *held*, proper, because joinder is essentially a matter of trial discretion to promote the convenient administration of justice (GCR 1963, 206.1).

---

REFERENCES FOR POINTS IN HEADNOTES
[1]  39 Am Jur, Parties §§ 32, 33.
[2]  27 Am Jur 2d, Equity § 238.
[3]  27 Am Jur 2d, Equity § 57; 39 Am Jur, Nuisances §§ 147, 148.
[4]  52 Am Jur, Towns and Townships § 24.
[5, 6, 9, 23]  58 Am Jur, Zoning §§ 150, 151.
[7]  58 Am Jur, Zoning §§ 153, 154.
[8, 11, 15, 19]  58 Am Jur, Zoning § 158 *et seq.*
[10]  58 Am Jur, Zoning §§ 138, 178 *et seq.*
[12–14, 16, 17]  58 Am Jur, Zoning §§ 96, 98, 99.
[18]  58 Am Jur, Zoning § 19.
[20]  39 Am Jur, Nuisances § 11.
[21, 24]  39 Am Jur, Nuisances § 197 *et seq.*
[22]  20 Am Jur 2d, Costs § 72 *et seq.*
[25]  5 Am Jur 2d, Appeal and Error § 1014.

2. EQUITY—JURY TRIAL.

> The provision of the Constitution abolishing the distinction between law and equity proceedings does not confer the right to jury trial in matters traditionally equitable in nature, and although the Constitution also provides that the right to "trial by jury shall remain", it does not purport to extend it to equitable actions (Const 1963, art 1, § 14; art 6, § 5).

3. NUISANCE—ABATEMENT—EQUITY—CRIMINAL LAW—JURISDICTION.

> Equity has jurisdiction in actions for abatement of nuisance even where the nuisance is also a violation of a penal law.

4. TOWNSHIPS—POLICE POWER—STATE ENABLING ACTS.

> Townships have no police power of their own and may exercise such power only by grant from the State extended through enabling acts.

5. MUNICIPAL CORPORATIONS—ZONING ORDINANCES—NONCONFORMING USE.

> A use of land, to qualify as a nonconforming use upon passage of a zoning ordinance, must be a substantial use.

6. SAME—ZONING ORDINANCE—NONCONFORMING USE.

> "Substantial" use, in connection with the establishment of a nonconforming use under a zoning ordinance, is concerned both with a qualitative appraisal of the extent of the use and with its timing relative to adoption of zoning ordinance.

7. NUISANCE—ABANDONMENT—MINES AND MINERALS—EVIDENCE—NONUSE.

> Trial court's finding of abandonment in nuisance action as to 1 parcel of defendant's land where quarrying of sand and gravel had been carried on for 30 years, *held,* unsupported by evidence, abandonment of interests in realty not being inferred merely from 3 or 4 years of nonuse.

8. TOWNSHIPS—ZONING ORDINANCES—NONCONFORMING USES.

> Nonconforming uses in land may not expand, since township zoning ordinances aim toward the eventual elimination of nonconforming uses in order to effectuate land development sought by the ordinances.

9. SAME—ZONING ORDINANCES—NONCONFORMING USES.

> An entire parcel may not be reserved for a nonconforming use under township zoning ordinances by beginning or conducting such a use on but a portion of the parcel.

10. SAME—ZONING ORDINANCES—NONCONFORMING USES—TERMINATION.

Townships have no power to provide for the timed termination of a nonconforming use.

11. SAME—ZONING. ORDINANCES—NONCONFORMING USES—EXTENSION—LIMITATION—MINES AND MINERALS.

Operator of sand and gravel quarry having a nonconforming use because his quarry was in operation when township zoning ordinance was adopted, placing his property in a residential district, is not thereby entitled to extend his excavations to areas not yet excavated without obtaining a permit but is limited to excavations in the area under excavation at time ordinance was adopted.

12. SAME—ZONING ORDINANCES—MINES AND MINERALS.

Courts have shown great concern over destruction of valuable mineral deposits by local zoning ordinances, recognizing the difference between ordinances prohibiting commercial uses in residential districts which may be conducted elsewhere with equal profit and ordinances which wholly deprive land owners of valuable minerals.

13. NUISANCE—TOWNSHIPS—ZONING ORDINANCES—NONCONFORMING USES—MINES AND MINERALS.

Trial court's determination that operation of sand and gravel quarry on defendant owner's land was a public nuisance under township zoning ordinance placing his property in a residential district, *held,* error, where the quarry was in operation at the time the ordinance was adopted, and was a nonconforming use.

14. TOWNSHIPS—ZONING ORDINANCES—NONCONFORMING USES—SAND AND GRAVEL QUARRY.

Defendants who were operating sand and gravel quarry on land zoned residential by township ordinance, but who had established a nonconforming use, *held* to have the right to continue operation of quarry on established excavation sites even though by so doing the area of use may increase, but not the right to start new sites.

15. SAME—ZONING ORDINANCES—NONCONFORMING USES—NONEXPANSION.

The rule, that nonconforming uses in land under township zoning ordinances may not expand means that unused land may not be reserved in anticipation of actual use.

16. MINES AND MINERALS—TOWNSHIP ZONING ORDINANCES.

Proposition that courts are reluctant to sanction destruction of mineral rights by township zoning ordinances means that excavation sites in existence at the time of ordinance enactment may be worked in the usual manner where mineral deposits dictate, but when a site, with its enlarged area, no longer yields, the use is consummated.

17. TOWNSHIPS—ZONING ORDINANCES—MINES AND MINERALS—NON-CONFORMING USES.

Operation of sand and gravel quarry, which is a permitted non-conforming use in an area zoned residential by township ordinance, will involve an increase in area and depth, but no virgin areas may thus be exploited, the Court recognizing township's ordinance objectives of both ultimate elimination of the nonconforming use without zoning the quarry out of business and promotion of land development in surrounding areas.

18. SAME—NONCONFORMING USES—CONDEMNATION.

Townships desiring to abate a nonconforming use should use condemnation as the appropriate procedure.

19. SAME—ZONING ORDINANCES—MINES AND MINERALS—NONCONFORMING USES.

Operation of sand and gravel quarry, which is a nonconforming use in an area zoned residential by township zoning ordinance, is permitted to continue until such time as the quarry area so increases, or the surrounding residential area so develops, that the rights of others would be unreasonably interfered with.

20. NUISANCE—ABATEMENT.

The relief granted on the basis of a nuisance *per se* is broader than that which would be permissible under a private nuisance claim.

21. SAME—ABATEMENT—NONCONFORMING USES.

Actual nuisance is abatable without consideration that it is a nonconforming use under a township zoning ordinance.

22. COSTS—ATTORNEY FEES—BAD FAITH PLEADING.

Trial court's award of attorney fees to cross-defendant, who had to defend against an allegation of conspiracy with plaintiff township to deprive named defendants of their sand and gravel business, *held*, neither error nor an abuse of discretion, where trial court determined the allegations were made without any basis of fact, under court rule imposing reasonable costs, including attorney fees, upon a claimant for bad faith pleading (GCR 1963, 111.6).

23. TOWNSHIPS—ZONING ORDINANCES—NONCONFORMING USES—NUI-
    SANCE.
    Finding of trial court that only a portion of operation site
    of sand and gravel quarry in an area zoned residential by
    township ordinance was a nonconforming use, because such
    parcel was in operation at the time the ordinance was enacted,
    *held*, modified to the extent that the nonconforming use is
    recognized in all areas of the sand and gravel quarry opera-
    tion under dispute.

24. SAME—ZONING ORDINANCES—NUISANCE—MINES AND MINERALS.
    Finding of trial court that operation of sand and gravel quarry
    in an area zoned residential by township ordinance was an
    actual nuisance, *held*, proper, where evidence presented showed
    that large quantities of dust were blown onto and into many
    plaintiffs' homes, unreasonably loud noises were created by
    earth-moving machinery, house foundations were shaken by
    ground-breaking equipment, offensive odors emanated from
    stagnant water in quarry pits, and the whole area was an
    attractive nuisance to children.

25. COSTS—NEITHER PARTY PREVAILING IN FULL.
    No costs are allowed on appeal from judgment of trial court
    enjoining operation of sand and gravel quarry, neither party
    having prevailed in full.

Appeal from Macomb; Carroll (Howard R.), J.
Submitted Division 2 May 2, 1967, at Detroit.
(Docket Nos. 1,261, 1,494.)  Decided December 8,
1967.  Applications for rehearing: by plaintiff
Township of Shelby, denied January 22, 1968; by in-
dividual plaintiffs, denied February 16, 1968; by
defendants Forster, Lubbers, and Oswald, denied
February 16, 1968.

Complaint by Joseph Fredal and 19 neighboring
property owners; Township of Shelby, a Michigan
municipal corporation; and Country Lane Home-
owners' Association, a Michigan nonprofit corpora-
tion, against Leonard Forster, John Lubbers, Arthur
Oswald, William Gritzinger, Sr., William Gritzinger,
Jr., and John Migut for injunction to stop operation
of a sand and gravel quarry.

Combination counterclaim and cross-claim by defendants Forster, Lubbers, and Oswald against all plaintiffs for damages for misrepresentation causing temporary injunction of quarry operation, and against cross-defendant Migut, plaintiff Township of Shelby, and Loren E. Evans, Mae E. Stecker, Jack B. Millard, Floyd Parrot, Walter B. Oshinsky, Odilon Houtekier, and Clifton Pemberton, members of the township board of the Township of Shelby, for damages for conspiracy to deprive defendants of their quarry business.

Actions consolidated for trial and appeal. Judgment for plaintiffs permanently enjoining operation of quarry, dismissing combination counterclaim and cross-claim, and awarding attorney fees to cross-defendant Migut. Defendants and cross-plaintiffs Forster, Lubbers, and Oswald appeal. Judgment modified, and case remanded for appropriate relief; award of attorney fees affirmed.

*Walter P. Cynar,* for individual plaintiffs.

*Roy W. Rogensues,* for plaintiff Township of Shelby.

*Roland L. Olzark,* for plaintiffs Joseph and Frances Fredal.

*Anthony Renne,* for defendants and cross-plaintiffs Forster, Lubbers, and Oswald.

*Kenneth N. Kramer,* for cross-defendant Migut.

J. H. Gillis, J. Plaintiffs brought an action to permanently enjoin and restrain the operation of a gravel pit and the use of defendants' land for quarrying purposes.

The plaintiffs are 20 neighboring property owners[1] and the township in which the quarry land is located. Operation of the property as a quarry site was permanently enjoined by judgment of the trial court and defendants appeal from that order.

A second case arising out of the same proceedings is consolidated on this appeal. The basis of that appeal is the combination counterclaim and cross-claim filed in the trial court by defendants, Forster, Lubbers, and Oswald alleging conspiracy. The sole issue on the combination counterclaim and cross-claim is the propriety of the allowance of reasonable attorney's fees for allegations which the trial court found to have been unwarranted.

The record reveals that defendant Leonard Forster was the owner of the southeast 1/4 of section 18, township 3 north, range 12 east, situated within Shelby township. He inherited this parcel in 1934 and since that time has quarried portions of the parcel through various licensees and lessees. A number of these licensees or lessees were made defendants along with Forster; John Lubbers and Arthur Oswald, individually and as copartners, doing business as A & J Sand Co.; William Gritzinger, Sr., and William Gritzinger & Son; and John Migut, doing business as General Sand Co. Gritzinger & Son and General Sand Co. were subsequently dismissed as defendants.

Plaintiffs alleged that the quarry operation was a public nuisance, as a violation of the Shelby township zoning ordinance, art 17, § 17.02, and therefore a nuisance *per se*[2] as well as a private nuisance. They sought injunctive relief and rehabilitation of the land in controversy. A preliminary injunction

---

[1] Country Lane Estates Homeowners' Association, also joined as a party plaintiff, was dismissed by the trial court as it was not a real party in interest.

[2] CL 1948, § 125.294 (Stat Ann 1958 Rev § 5.2963[24]).

issued enjoining sand and gravel operations on the
described property.  Motions by defendants to dis-
miss and for rehearing in regard to the preliminary
injunction were denied.  Additional defense motions
to separate the township plaintiff from the other
plaintiffs into separate suits for trial, or to dismiss
the action as to either of them, as well as defense de-
mand for jury trial, were denied.

By counterclaim, defendants Forster, Lubbers,
and Oswald claimed damages against the individual
plaintiffs based on an allegation that plaintiffs' mis-
representations caused the preliminary injunction to
issue.  They also proceeded against plaintiff Shelby
township and cross-defendant Migut for an alleged
illegal conspiracy to put the countercomplainants out
of business for the benefit of Migut.  It appears that
these allegations were based upon the township's
grant to Migut of permission to quarry at another
site, to the detriment of countercomplainants' busi-
ness.  This combination countercomplaint and cross-
complaint was dismissed *in toto,* and the issue arising
therefrom is the aforementioned allowance of costs
and attorney fees in favor of John Migut, against
Forster, Lubbers, and Oswald, in the sum of $2,696-
.25.

Since the quarrying operations commenced on de-
fendant's parcel in the 1930's, the use of the property
as such has been scattered and sporadic.  The trial
court referred to the entire parcel as if it were di-
vided into quarters in making its determination as to
the use thereof.  Although such division is arbitrary,
we employ it here solely as an aid to visualization.

As to the NW 1/4 of the SE 1/4, from 1930 to
1960 some quarrying was conducted by Ray Indus-
tries.  The court found this site to have been aban-
doned in 1960 or 1961.

As to the NE 1/4 of the SE 1/4, in the 1956–1957
period a 2-acre quarry site was established during

which time defendant Gritzinger & Son removed some 45,000–50,000 cubic yards. In 1958, one Wineberger removed approximately 6,600 cubic yards.

As to the SE 1/4 of the SE 1/4, in this area, particularly the southernmost 25 acres, a large operation (apparently the bulwark of defendant's business) was established, which continued until the time of this suit.

The record does not establish that any use was commenced in the SW 1/4 of defendant's parcel.

In 1953, defendant's entire quartersection was zoned residential. The following year, however, a nonconforming use was granted by Shelby township Ordinance No 13 (1954) which rezoned the entire parcel industrial and provided for its use as a quarry site.[3] As set forth above, considerable quantities of sand and gravel have been extracted from the parcel subsequent to the ordinances of 1953 and 1954.

In 1958, the area immediately contiguous to the north, on the easterly side of defendant's property, was subdivided into the Country Lane Estates, in which the individual plaintiffs purchased homes. The situation as it then existed was that the Estates was zoned residential and defendant's property was zoned for nonconforming quarrying purposes. Physically, as the evidence established, the northeasterly portion of defendant's parcel was not then being used for quarrying purposes as far as any of the plaintiff homeowners could visually discern. There was testimony to the effect that this portion of defendant's property appeared to be agricultural, with a barn, livestock, and farm equipment within view of the plaintiffs' homes.

Shelby township, in 1963, rezoned defendant's property to residential. Quarrying was to be per-

---

[3] The conditions recited in the special ordinance are not here set forth as no claim is made that defendant's use was not in compliance therewith.

mitted only by application to the township board, and only under certain specified conditions. Admittedly defendant has not acquired a permit nor sought permission to conduct a quarrying operation.

The event which triggered this present litigation occurred in the fall of 1964. At that time A & J Sand Co., and General Sand Co., pursuant to an agreement with Forster, began a large scale quarrying operation in the northeast section of defendant's property. Cranes, trucks, and other equipment were moved into the area. A similar operation was simultaneously commenced in the southeasterly section. The homeowners alleged that large quantities of dust were caused to blow onto and into their homes, that unreasonably loud noises were created and that defendant's ground-breaking equipment caused their very foundations to shake. They also complained of odors emanating from stagnant ponds created in the quarry pits, of an attractive nuisance to children in the area, and that the general area of operation was unsightly.

Charged with great emotionalism on all sides, a 10 day trial ensued which resulted in a court order which enjoined quarrying operations on this property except as to the southeasternmost 25 acres.

The court below described the various mining activities which occurred prior to October 1964 as of such a minor degree as to constitute no private nuisance. As to the activities complained of here, which occurred subsequent to October 1964, the court found that the character and magnitude of these mining operations, the manner of conducting them and the noise and dust produced thereby constituted a private nuisance. The court found the proofs as to private nuisance "positive, clear and credible".

The court further found a public nuisance in all areas of the SE 1/4 of section 18, except the souther-

ly 1,200 feet of the property.  Here the court found a legal nonconforming use.[4]  The court stated that its decision was based on *Township of Farmington* v. *Scott* (1965), 374 Mich 536, 542, wherein the Court held that a legislature may determine that a violation of a township ordinance is a nuisance *per se* without showing that anyone was hurt by its violation. The trial court found here that as nonconforming use had been abandoned or not established except in the 1,200-foot area described, the remainder of the property was subject to the terms of the existing ordinance rather than excepted therefrom.  Defendants contended below, as they do here, that a nonconforming use has been established as to the entire tract.

In reviewing the use as it existed at the time of enactment of the 1963 ordinance, the trial court found that operations in the northwesterly section had been abandoned in 1960 or 1961.  It also found that the use in the northwesterly section was "small" and was not established prior to enactment.  Both of these latter findings are challenged in this Court and shall be dealt with in place.

Before reaching the substantive issues, we shall answer the procedural questions raised by appellants.  They claim: (1) an improper joinder of the private plaintiffs with the public plaintiff, and (2) error in denying their demand for a trial by jury.

We find no merit in either of these contentions.

The rule covering joinder is GCR 1963, 206.1, which provides:

. "All persons may join in 1 action as plaintiffs

"(1) if they assert any right to relief jointly, severally, or in the alternative, in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of

---

[4] CL 1948, § 125.286 (Stat Ann 1958 Rev § 5.2963[16]).

law or fact common to all of them will arise in the action; or

"(2) if it appears that their presence in the action will promote the convenient administration of justice.

"All persons may be joined in 1 action as defendants

"(1) if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action; or

"(2) if it appears that their presence in the action will promote the convenient administration of justice.

"A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be rendered for 1 or more of the parties against 1 or more of the parties as the rights and liabilities of the parties appear."

GCR 1963, 206, as indicated by the committee notes (1 Honigman & Hawkins, Michigan Court Rules Annotated [2d ed], p 577) is essentially a matter of trial convenience, or to promote the convenient administration of justice. Here, individual plaintiffs proceed on 2 theories of nuisance; in fact, and *per se*. The township joined on the latter theory, asserting the same issues of violation, and seeking similar (albeit broader) relief. Witnesses, facts, allegations of the violative uses, the injuries asserted, and the equitable principles run intertwined throughout the claims of the respective parties. We find proper joinder here, as, in the trial court's discretion, the interests of justice are so served. *Brown* v. *Forrester Construction Company* (1963), 372 Mich 204, 209. Further, we perceive it to be to defendants' advantage to have these issues tried together rather

than to be subjected to multiple lawsuits by the separate plaintiffs on their respective claims. *Cf. Gilmer* v. *Miller* (1947), 319 Mich 136.

Defendants' claim for a trial by jury is based on a misconception of the meaning of the unity of law and equity as set forth in Const 1963, art 6, § 5, which states:

"The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state. The distinctions between law and equity proceedings shall, as far as practicable, be abolished."

Defendants' arguments, in substance, are that the merger of law and equity effected under article 6, § 5 serves to guarantee a jury trial (on proper demand) in all civil cases. The right to a jury trial in civil cases is found in Const 1963, art 1, § 14: "The right of trial by jury shall remain." As early as 1889, Justice CAMPBELL dispelled the very notion now offered by defendants, *Brown* v. *Kalamazoo Circuit Judge* (1889), 75 Mich 274, 284:

"The very wise provision of our Constitution [1850] which by section 5 of article 6 directs the legislature to abolish distinctions between law and equity proceedings, is carefully worded, and requires it to be done only as far as practicable."

Continuing, Justice CAMPBELL points out that the provision is intended to "abolish systems of procedure which had become overtechnical", but not to abolish those classes of rights which have formerly been described as "equitable" and those formerly described as "legal". The opinion continues, holding at p 285:

"Juries cannot devise specific remedies, or safely deal with complicated interests, or with relief given in successive stages, or adjusted to varying condi-

tions. Theory amounts to nothing in the history of jurisprudence. The system of chancery jurisprudence has been developed as carefully and as judiciously as any part of the legal system, and the judicial power includes it, and always must include it. Any change which transfers the power that belongs to a judge to a jury, or to any other person or body, is as plain a violation of the Constitution as one which should give the courts executive or legislative power vested elsewhere. The cognizance of equitable questions belongs to the judiciary as a part of the judicial power, and under our Constitution must remain vested where it always has been vested heretofore."

So we are reminded that trial by jury "is the sword in the bed that prevents the complete union of law and equity".[5] As to matters traditionally equitable, no right exists as a matter of law to a determination by a jury. *Detroit Trust Company* v. *Struggles* (1938), 283 Mich 471; *Chamberlain* v. *Eddy* (1908), 154 Mich 593; *Sokel* v. *Nickoli* (1959), 356 Mich 460, 467. This distinction between actions traditionally legal and those traditionally equitable exists today. *Fenestra Incorporated* v. *Gulf American Land Corporation* (1966), 377 Mich 565.

As such, there is no room for doubt that an action to abate nuisance is equitable in nature, even where, as here, the nuisance is also allegedly in violation of a penal provision. *Detroit Realty Company* v. *Barnett* (1909), 156 Mich 385. The fact that an injunction if issued will restrain a criminal act, "will not stay the chancellor's hand". *Township of Garfield* v. *Young* (1957), 348 Mich 337, 341; *Dearborn National Insurance Company* v. *Commissioner of Insurance* (1950), 329 Mich 107.

---

[5] Taken from an unpublished lecture by Professor Zechariah Chafee, Jr., late professor of law, Harvard University.

The action on the statutory nuisance, or nuisance *per se,* is a legislatively created action to give teeth to local zoning enactments. Although the statute itself creates a new remedy at law, it declares that violations of an ordinance are a nuisance *per se.* It is within the power of the legislature to provide equitable remedies for statutory actions; and by the declaration that such a violation is a nuisance *per se,* equity is given jurisdiction as in the case of any other nuisance. *Township of Farmington* v. *Scott* (1965), 374 Mich 536; *Portage Township* v. *Full Salvation Union* (1947), 318 Mich 693.

On the merits of the claimed nonconforming use, defendants must be able to show such established use in existence at the time of enactment of the ordinance. The proofs make out a clear case of private nuisance, but it is necessary to decide whether the nuisance *per se* has been shown in order to decide the remaining question of the propriety of the relief granted.

Since townships have no police power of their own, they may exercise such power only by virtue of grant by the State. In the case of zoning, the power is extended through State zoning enabling acts, and in this case by the rural township zoning enabling act.[6] Built upon the Federal and State Constitutions as a point beyond which the statute may not authorize, the legislature must decide which interest is to give way for the greater good of all. Insofar as the present controversy is concerned, the legislature has provided that:

"The lawful use of any dwelling, building or structure and of any land or premise as existing and lawful at the time of enactment of a zoning ordinance  *  *  *  may be continued although such use

6 CL 1948, § 125.271 *et seq.* (Stat Ann 1958 Rev § 5.2963[1] *et seq.*).

does not conform with the provisions of such ordinance or amendment."[7]

The issue before us at this juncture is whether defendant Forster has established such a nonconforming use on his premises and, if so, to what extent?

In the northeasterly portion of the land approximately 51,000–57,000 cubic yards had been removed over a 3-year period from 1956–1958. Excavations were taken from a 2-acre area. The trial court found this use to be "small" and not to have established a nonconforming use under the doctrine of *Township of Bloomfield* v. *Beardslee* (1957), 349 Mich 296. In *Beardslee,* defendants owned 1 parcel which they used as a quarry and purchased a second parcel early in 1951. In 1952, the parcels were zoned residential, and defendants claimed a nonconforming use as to the second parcel. At the time of the ordinance, defendants had removed something over 1,000 cubic yards of gravel. A minority of the Court[8] held that mere preparation or occasional operations are not sufficient to establish a nonconforming use, sustaining the trial court's finding of "meager" use.

It appears less than meaningful to have often extremely valuable property rights hinging on such quantitative terms as "small" (51,000–57,000 cubic yards in the present case) or "meager" (1,000 cubic yards in *Beardslee*). The rule is clear that such a use, to qualify, must be "substantial" (see *City of Lansing* v. *Dawley* [1929], 247 Mich 394), but "substantial" seems to say no more than "not small" or "not meager". "Substantial", in the manner in which the word is used in this type of case, appears to have a dual meaning; it reflects a qualitative appraisal of the extent of the use and it is concerned with the

7 CL 1948, § 125.286 (Stat Ann 1958 Rev § 5.2963[16]).

8 Although the majority did not repudiate this "occasional use" theory, it did not follow it, but chose to base its concurrence on a public nuisance theory.

timing of the use relative to the time of enactment of the ordinance. This latter phenomenon is what Crawford has called "the zoning horserace".[9] The point is certainly appropriate and is illustrated by *Adams* v. *Kalamazoo Ice & Fuel Co.* (1928), 245 Mich 261, where the use was instituted in anticipation of the ordinance but preceded it in time. The use in *Adams* was sustained.

The "occasional use" theory relied upon by the trial court in the instant case is not supported by *Beardslee*. In the present case, quarrying was carried on for 3 years and over 50,000 cubic yards were removed more than 5 years before enactment of the ordinance. Factually, this is not a *Beardslee* situation, nor does the instant case fit into those decisions of other states cited by the minority there. Especially in view of the fact that the majority of the *Beardslee* Court did not base its decision on the occasional use theory, we find that defendant has an established nonconforming use in the northeasterly section of his parcel. We shall deal with the extent of this use subsequently.

In the northwesterly section, quarrying was carried on for some 30 years prior to enactment, the last use being about 1960. The trial court found this use to have been abandoned in 1960 or 1961. We find that the evidence does not support such a conclusion of abandonment. As stated in *Doty* v. *Gillett* (1880), 43 Mich 203, 206, 207:

"Rights and interests in real estate cannot, by inference from nonuser alone, safely be considered as having been abandoned or surrendered."

As to the southerly 1200 feet of the southeasterly section, we are in agreement with the trial court that a nonconforming use has been established.

---

9 Crawford, Michigan Zoning and Planning, § 5.02[3].

The obvious next question is the extent of the uses which have been established. In this regard there are two considerations established in the cases which are, at times, at odds. As a first proposition, zoning must aim toward the eventual elimination of nonconforming uses in order to effectuate the growth and development sought by the ordinances. *Austin* v. *Older* (1938), 283 Mich 667. Thus, the rule is that nonconforming uses may not expand, even though it may be that such expansion is necessary to remain competitive. *City of Hillsdale* v. *Hillsdale Iron & Metal Company, Inc.* (1960), 358 Mich 377.

The cases on "expansion" in this jurisdiction have not dealt with fact situations guiding the present case—that is, the taking of minerals. We are, however, committed to the proposition that an entire parcel may not be reserved for a nonconforming use by beginning or conducting such a use on but a portion of the parcel. See *Patchak* v. *Township of Lansing* (1960), 361 Mich 489.

The second proposition by which we are bound is that a township has no power to provide for the timed termination of a nonconforming use. *DeMull* v. *City of Lowell* (1962), 368 Mich 242. In *DeMull,* the ordinance set a 3-year limitation on a nonconforming junkyard. The Court discussed the proposed legislation which would have given municipalities the power to set a time limitation on such uses, and the opinion of the Attorney General[10] that such a provision allowing for time limits would be invalid. The Court concludes (*DeMull, supra,* at p 252):

"The legislature heeded the foregoing opinion and meaningfully eliminated, from then drafted section 3a, authorization to do that which the defendant city has attempted to ordain. Thus it must be held that

---

10 OAG, 1947–1948, No 146, p 217 (March 7, 1947).

section 9A of the city's zoning ordinance is invalid for want of legislative warrant.

"So far the legislature has permitted ordinances providing only for resumption, restoration, reconstruction, extension, or substitution of nonconforming uses. It has withheld permission to destroy them, by time limitation or otherwise."

· Between these prevailing concepts of nonexpansion and nondestruction lie the peculiar problems of a quarry operation. An operator digs a hole and establishes a use on a small percentage of a very large tract. The nonexpansion doctrine would have us limit the nonconforming use to that small hole. The nondestruction doctrine would permit of an expansion in area in order that the operation might continue where the minerals are found. Thus, the argument is made that in the case of "diminishing assets" the owner may go wherever on his land the mineral deposits are found—that a larger tract than was immediately needed was purchased for that very purpose. This was the view taken by the trial court in *Dolomite Products Co., Inc., v. Kipers* (1964), 42 Misc 2d 11 (247 NYS2d 396), where an established quarry use was extended to 2 other parcels even though no quarrying had yet commenced on the latter parcels. The appellate division reversed the ruling of the trial court and held that no use had been established as to the 2 other parcels, 23 App Div. 2d 339 (1965) (260 NYS2d 918), and the court of appeals affirmed, 19 NY2d 739 (279 NYS2d 192).

*Dolomite* could be distinguished in that there, as in *Beardslee, supra,* it was attempted to set up a use on a different parcel from that on which the use had been previously established. The reasoning of these cases, however, is especially cogent. As the Supreme Court stated in *Beardslee, supra,* at p 303:

"Attractive though the argument may seem upon its first reading, it must be obvious that a logical application of its principle would be destructive of all zoning. For in each case the particular parcel has, it is always asserted, some peculiar utility: it is an ideal spot for a motel, or a factory, or a junk-yard, or what not. It has that contiguity to traffic, that peculiar topographical structure, that supply of water or shade, which makes it unique. Yet, just as the surface user desired by the owner must give way, at times, to the public good, so must the subsurface exploitation."

The logic is persuasive that zoning would soon run into an absolute impasse if large tracts of land may be dedicated to a nonconforming use by beginning that use on a different parcel or in a small area of a single large tract. The result would be obvious —one owning hundreds of acres of land might forever claim the use of that land for quarrying by beginning a pit in any small corner. We adopt the following language of the New York trial court in *People* v. *Gerus* (1942), 69 NYS2d 283, 288:

"I cannot accede to the argument that a person owning, for example, 100 acres of land, who is engaged in excavating sand therefrom as a business at the time of the enactment of the zoning ordinance placing his property in a residential zone, may, nevertheless, continue to extend the operation of that business to the entire 100 acres. To follow such argument to its logical extreme would result in making zoning almost, if not entirely, impossible."

Before reconciling these two propositions as to the present case, it is necessary to discuss what might be termed a third proposition, a subproposition, or a guide. This tempering element is simply the great concern our courts have expressed over the destruction of valuable mineral deposits by local ordinances. It might be thought of as a matter of

general public policy which, if not expressly contained in the enabling acts, merits our consideration by the decisions of our Supreme Court. While no case we have found decides this issue, the cases do express a concern over mineral rights—and we note and guide ourselves by those expressions.

The source of such expression by our Supreme Court is found in *Village of Terrace Park* v. *Errett* (CA 6, 1926), 12 F2d 240. Mr. Errett challenged a township ordinance which zoned his quarry land residential. Although the attack there was on the reasonableness of the ordinance, the following passage is found at p 243:

"There is also a substantial difference between an ordinance prohibiting manufacturing or commercial business in a residential district that may be conducted in another locality with equal profit and advantage, and an ordinance that wholly deprives the owner of land of its valuable mineral content."

*Errett* was cited in *City of North Muskegon* v. *Miller* (1929), 249 Mich 52, where again an ordinance prohibiting the taking of oil was held unreasonable. There, the land was found unsuited for the purposes for which zoned. Finally, in the majority opinion in *Beardslee, supra,* at pp 310, 311, four Justices refused to accept the "occasional use" theory of the minority and, by Justice BLACK writing, rested their decision on a finding of an enjoinable public nuisance (in fact):

"My caution, in refraining from support of this ordinance as applied to defendants' asserted right of use of their lands, may indeed be due to an excess of concern over the implications of zoning the depths distinguished from zoning the surface. Such concern is, nevertheless, sustained by respected authority we have followed, * * * wherein stress is laid upon the importance of 'not destroying or withhold-

ing the right to secure oil, gravel, or mineral from one's property, through zoning ordinances, unless some very serious consequences will follow therefrom.' "

See, also, *Certain-teed Products Corporation* v. *Paris Township* (1958), 351 Mich 434, 466.

Guided then by two conflicting propositions and tempered by a third, we find that the established sites in defendant owner's northeastern, northwestern, and southeastern portions of his property may be continued even though by so doing the area of use may thereby increase. We construe the meaning of the nonexpansion rule, as it relates to quarries, that heretofore unused land may not be reserved in anticipation of actual use. No new sites may be started.

We construe the meaning of the nonextinction proposition to mean, especially in light of the fact that mineral rights are here involved, that sites in existence may be worked in the usual and ordinary manner where the deposits dictate. When a site, with its enlarged area, no longer yields, the use is consummated.

In a situation such as the present, it is a fine line which separates "expansion" from "continuation", and we tread lightly, for on either side of the line innocent parties may suffer. "Continuation" in the case of minerals must involve an increase—either in area or depth. But no virgin areas may thus be exploited. This, we believe, will lead to the ultimate elimination of the use without zoning the owner out of business, for in effect, he is only allowed to continue that which he has begun. Also, this will allow for the development of the surrounding areas for which the township has obviously provided by its ordinance.

If the township would abate the uses we have thus outlined, and if such use creates no actual nuisance,

then condemnation is the appropriate way to proceed. *DeMull* v. *City of Lowell, supra.*

There is no showing in this case of actual nuisance save from the 1964 operation in the northeasterly section. Defendant owner has established nonconforming uses in the northeastern, northwestern, and southeastern sections where existing excavation sites were established prior to the 1963 enactment. The use of these sites may be continued until such time as their area so increases, or the surrounding area so develops, or both, that the rights of others would be unreasonably interfered with.

Private nuisance plays no part in our decision, for even though we are convinced that it has been proven, the relief granted on the basis of nuisance *per se* is broader than that which would be permissible under a private nuisance claim.[11] Whether nonconforming use or not, neither we nor the trial court will countenance this or any other use which is, or becomes, an unreasonable interference with the rights of others. Defendants should plan their continuation as to avoid future interference with development of surrounding areas. Actual nuisance is abatable without consideration of nonconforming use. See *Beardslee, supra* (majority opinion); *Civic Association of Dearborn Township, District No 3* v. *Horowitz* (1947), 318 Mich 333.

On the matter of attorney fees allowed to crossdefendant Migut, we find no error or abuse of discretion by the trial judge. This issue arises from the aforementioned combination countercomplaint and cross-complaint, and is the sole issue in case No. 1,494, consolidated on this appeal. To reiterate, this claim alleged that Migut and the township of Shelby entered into a conspiracy to deprive Forster and oth-

---

11 See *Cullum* v. *Topps-Stillman's, Inc.* (1965), 1 Mich App 92; *MacKenzie* v. *Frank M. Pauli Co.* (1919), 207 Mich 456; *Ballentine* v. *Webb* (1890), 84 Mich 38.

ers of their sand and gravel business. The claim was evidently predicated upon Migut's having obtained a permit to mine a former site which had lain dormant of late.

GCR 1963, 111.6 provides:

"If it appears at the trial that any fact alleged or denied by a pleading ought not to have been so alleged or denied and such fact if alleged is not proved or if denied is proved or admitted, the court may, if the allegation or denial is unreasonable, require the party making such allegation or denial to pay to the adverse party the reasonable expenses incurred in proving or preparing to prove or disprove such fact as the case may be, including reasonable attorney fees."

In this case, the trial court found that these allegations

"were made without any basis of fact or reasonable inference therefrom. Such unfounded unjustified allegation required joining of issue, preparation for trial and trial. They should not have been so made and were unreasonable. Costs and attorney fees must be here allowed."

Elucidation on the applicability of GCR 1963, 111.6 may be found in 1 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), 1967 Pocket Part pp 37, 38, as well as 2 Honigman & Hawkins (2d ed), p 220.

The finding of the trial court is modified to the extent that the nonconforming use is recognized in the northeast, northwest, and southeastern portions. The finding of actual nuisance is affirmed and the case is remanded for appropriate relief. Award of attorney fees is affirmed.

No costs, as neither party prevailed in full.

LESINSKI, C. J., and WEIPERT, J., concurred.